92 F.3d 1162
 18 ITRD 1485
 KOYO SEIKO COMPANY, LTD., and Koyo Corporation of U.S.A,
Plaintiffs-Appellants,
v.
The UNITED STATES and Department of Commerce, Defendants-Appellees,
and
The Torrington Company and Federal-Mogul Corporation,
Defendants-Appellees.
 No. 96-1116.
 United States Court of Appeals,
Federal Circuit.
 Aug. 12, 1996.
 
 Neil R. Ellis, Powell, Goldstein, Frazer & Murphy, Washington, D.C., argued, for plaintiffs-appellants. With him on the brief were Peter O. Suchman, Susan M. Mathews, and Lee Ann Alexander.
 Velta A. Melnbrencis, Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., argued, for defendants-appellees The United States and Department of Commerce. With her on the brief were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director. Also on the brief were Stephen J. Powell, Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, D.C., Berniece A. Browne, Senior Counsel, and Mark A. Barnett and Dean A. Pinkert, Attorney-Advisors.
 James R. Cannon, Jr., Stewart and Stewart, Washington, D.C., argued, for defendants-appellees The Torrington Company and Federal-Mogul Corporation. With him on the brief were Terence P. Stewart, William A. Fennell, and Timothy C. Brightbill.
 Before ARCHER, Chief Judge, NEWMAN and LOURIE, Circuit Judges.
 PAULINE NEWMAN, Circuit Judge.
 
 
 1
 Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A., Inc. (together "Koyo") appeal two aspects of the judgment of the Court of International Trade[1] sustaining the Final Results of the Department of Commerce, International Trade Administration (Commerce or ITA) second administrative review of the antidumping duty order on certain antifriction roller bearings from Japan. The Court of International Trade sustained Commerce's use of the "best information available" (BIA) rule to calculate the dumping margin for a certain class of bearings; we affirm that decision. However, on the issue of the doubtful debt reserve it was incorrect to treat this accounting procedure differently when calculating home market selling expenses and United States selling expenses. This aspect of the court's decision is reversed.
 
 DISCUSSION
 
 2
 The antidumping law provides that when Commerce determines that a class or kind of foreign merchandise is being sold in the United States at less than fair value, and the International Trade Commission determines that a United States industry is materially injured or threatened with material injury by imports of that merchandise, Commerce must publish an antidumping duty order and the Customs Service must assess an antidumping duty equal to the difference between the foreign market value and the United States price. 19 U.S.C. §§ 1673d and 1673e.[2] Commerce must, upon request, periodically review and redetermine the antidumping duty. 19 U.S.C. § 1675(a).
 
 
 3
 On May 15, 1989, Commerce published antidumping duty orders for certain antifriction roller bearings from Japan. Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings, and Parts Thereof from Japan, 54 Fed.Reg. 20,904 (Dep't Comm.1989). This appeal relates to the second administrative review, Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof from France, Germany, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom, 57 Fed.Reg. 28,360 (Dep't Comm.1992) (final results of antidumping duty administrative reviews), amended, 57 Fed.Reg. 59,080 (Dep't Comm.1992). Koyo appealed certain aspects of the review results to the Court of International Trade. The court sustained Commerce's determinations, and this appeal followed.
 
 
 4
 The Court of International Trade must sustain any determination, finding or conclusion found by Commerce on review of determinations on the record unless it is unsupported by substantial evidence or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Zenith Elec. Corp. v. United States, 77 F.3d 426, 430 (Fed.Cir.1996) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 216-17, 83 L.Ed. 126 (1938)). We review a decision of the Court of International Trade to decide, applying the statutory standard, whether Commerce's determinations should be sustained. NEC Home Elec., Ltd. v. United States, 54 F.3d 736, 742 (Fed.Cir.1995). Thus we review the findings and conclusions of the agency for evidentiary support and for compliance with law. Id.
 
 
 5
 * THE BEST INFORMATION AVAILABLE
 
 
 6
 Koyo states that Commerce unlawfully applied its BIA rule in calculating the dumping margin for one model of antifriction bearings. Use of the BIA, when actual data are not available, is authorized in 19 U.S.C. § 1677e(c):
 
 
 7
 In making their determinations under this subtitle, the administering authority and the Commission shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available.
 
 
 8
 See Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1190-91 (Fed.Cir.1990) (the burden of production is fairly placed on the importer).
 
 
 9
 * Koyo correctly states that unless the requisite information has been fairly requested, it is inappropriate to take recourse to secondary evidence such as the best information that can be gleaned from other sources. See Olympic Adhesives, Inc. v. United States, 899 F.2d 1565, 1572-75 (Fed.Cir.1990) (the BIA rule can not be used for data not requested). Koyo states that Commerce never requested cost data for the bearings here at issue.
 
 
 10
 Koyo points to certain apparently conflicting instructions, and fairly extensive correspondence and negotiations. However, it is sufficiently clear that Commerce requested from Koyo cost data for all bearings that continued to be subject to the antidumping duty order after use to make finished products in the United States. Koyo appears to have understood what was needed, for in a December 23, 1991 letter to Commerce Koyo stated:
 
 
 11
 Koyo's situation regarding these sales in the United States is very complex. Indeed, our response to the request for information in the questionnaire regarding these sales has been delayed because of this complexity, as well as the difficulty in obtaining resale information regarding the non-scope merchandise from U.S. companies whose relationships with Koyo are extremely tenuous.
 
 
 12
 Koyo eventually stated that it was unable to obtain this resale information from a United States affiliated company. Although Koyo continues to argue that it was not asked to provide the particular information here at issue, there is substantial evidence supporting the contrary finding by Commerce. When Koyo failed to supply the requested data for its affiliated company, Commerce was required to use the best information available.
 
 B
 
 13
 Koyo also contends that even if Commerce were found to have requested the data for these bearings, Commerce improperly and unfairly applied the BIA rule. According to Koyo, Commerce applied the "Roller Chain rule" too rigidly, thus preventing these bearings from being excluded from the antidumping duty order. The so-called Roller Chain rule is a de minimis exception to the requirement that dumping margins be computed for all United States imports at less than fair value. The rule is named for the ruling that implemented congressional intent that an antidumping duty be assessed only when significant amounts of imported merchandise are used in further manufacture or assembly before sale to unrelated purchasers. See Roller Chain, Other Than Bicycle, From Japan, 48 Fed.Reg. 51,801 (Dep't Comm.1983) (the entered value of the imported merchandise must be a significant part of the sales value of the finished merchandise in order to incur antidumping duty); H.R.Rep. 571, 93d Cong., 2d Sess. 70 (1973) (expressing congressional intent).
 
 
 14
 The Roller Chain rule applies only to imported goods that are not resold as imported but are incorporated into finished products in the United States, and the first sale to an unrelated person is of the finished product. To be excluded from the antidumping duty order, the entered value of the merchandise must be an insignificant portion of the value of the finished product when sold to unrelated customers in the United States. Commerce established a one percent threshold for determining significance. See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany et al., 54 Fed.Reg. 18992, 19090 (Dep't Comm.1989).
 
 
 15
 Commerce applied the one percent threshold in the first antifriction bearing administrative review, although it had initially proposed (but not used) a five percent threshold for that proceeding. Considerable deference is due to Commerce's reasonable statutory interpretation and its application. See Zenith Elec., 77 F.3d at 430 (Commerce was assigned broad discretionary authority in administering the antidumping statutes). With appropriate deference to the discretionary authority of the agency charged with administering the statute, the choice of the one percent figure is not unreasonable.
 
 
 16
 The bearings at issue comprise slightly more than one percent of the sales value of the finished product. Although Koyo argues that these bearings should be excluded from antidumping duty because they only slightly exceed the one percent threshold, Commerce did not abuse its discretion in applying its rule rigorously.
 
 C
 
 17
 Koyo also argues that Commerce did not reasonably apply the statutory definition of "exporter," as used in 19 U.S.C. § 1677a(e)(3), in requiring that Koyo obtain cost data from a United States affiliate "for whose account the merchandise is imported." Commerce applied the definition of "exporter" in 19 U.S.C. § 1677(13)(D):
 
 
 18
 (13) Exporter.--[the term includes]--
 
 
 19
 (D) any person or persons [who] own or control in the aggregate 20 percent of more of the voting power or control in the business carried on by the person for whom or for whose account the merchandise is imported into the United States, and also 20 percent or more of such power or control in the business of the exporter, manufacturer, or producer.
 
 
 20
 Commerce determined, and it is not disputed, that this Koyo affiliate met this criterion. Koyo states that its relationship with this importing affiliate is too distant for Koyo to have the leverage needed to obtain the cost data required by 19 U.S.C. § 1677a. However, the manufacturer of the finished product is in the best position to supply the information needed by Commerce in determining the relative value of the dumped component in the finished product. See Zenith Elec. Corp. v. United States, 988 F.2d 1573, 1583 (Fed.Cir.1993). The burden of production is appropriately placed on the party deemed to control the information. Because Koyo's affiliated company came within the 20% ownership or control test, Commerce reasonably looked to Koyo to supply the data. This was neither an abuse of discretion, nor a violation of law. When Commerce did not receive the needed data it lawfully applied the BIA rule, as authorized by 19 U.S.C. § 1677e(c).
 
 D
 
 21
 Koyo argues that the BIA rate used by Commerce was unnecessarily high, thus punishing Koyo for its inability to obtain the requested data. Commerce applied a 73.55% dumping margin based on the best information available. Koyo states that a lower, weighted average margin was calculated during the review.
 
 
 22
 Commerce applied its two-tier methodology for determining and applying the BIA rule. For importers that refuse to cooperate with the agency's investigation Commerce uses the first-tier rate, which is the highest dumping margin calculated for any party in the less than fair value (LTFV) investigation of the merchandise, or calculated in any administrative review. The second-tier rate is used when an importer cooperates but nonetheless fails to provide requested information. The second-tier rate is the higher of (1) the LTFV rate for the merchandise or (2) the highest calculated dumping margin during the review at issue for the same class or kind of merchandise from the same country. Here, Commerce applied the second-tier rate of 73.55% because while Koyo cooperated with the agency, Koyo's LTFV rate was higher than the dumping margin calculated in the review. This two-tier system has been sustained as "a reasonable and permissible exercise of the ITA's statutory authority to use the best information available when a respondent refuses or is unable to provide requested information." Allied-Signal Aerospace Co. v. United States, 996 F.2d 1185, 1192 (Fed.Cir.1993). Commerce's imposition of the second-tier BIA rate met these criteria.
 
 
 23
 The Court of International Trade's decision sustaining the application of the BIA rule, and the imposition of antidumping duty at the rate of 73.55%, is affirmed.
 
 II
 THE DOUBTFUL DEBT RESERVE
 
 24
 Commerce did not allow Koyo's doubtful debt reserve as a home market indirect selling expense, see 19 C.F.R. § 353.56(b) (offset of indirect selling expense to exporter's sales price), on the ground that it was not actual bad debt but simply a reserve account. Koyo challenges this decision, arguing that if the doubtful debt account is not allowed as a home market indirect selling expense, the analogous reserve must be excluded from the United States indirect selling expense in order to achieve the requisite fair comparison of home market and United States prices. The Court of International Trade sustained Commerce's treatment of the home market doubtful debt reserve, without commenting on Koyo's argument that Commerce failed to treat the two markets in a consistent manner.
 
 
 25
 The government and The Torrington Company state that Koyo did not adequately raise these arguments administratively. However, Koyo plainly and vigorously raised with Commerce its objection to the exclusion of its doubtful debt reserve in calculating home market selling expenses, and argued that these identical accounts in both markets should be given the same accounting treatment. Koyo's answers to the ITA questionnaire placed on the record the doubtful debt allowances for the home and United States markets. Although Koyo's challenge was directed to Commerce's removal of the reserve from home market selling expenses, Koyo's argument was based on Commerce's continued deduction of this reserve in calculating the United States sales value.
 
 
 26
 Commerce bears the obligation to make a "fair value comparison on a fair basis." Smith-Corona Group v. United States, 713 F.2d 1568, 1578 (Fed.Cir.1983), cert. denied, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). The comparison is not fair unless comparable items are treated comparably. See Torrington Co. v. United States, 68 F.3d 1347, 1352-53 (Fed.Cir.1995) (the statute and regulations require "adjustments to the base value of both foreign market value and United States price to permit comparison of the two prices at a similar point in the chain of commerce"). Commerce exceeded its authority in changing its accounting rule for home market indirect selling expenses without making a comparable adjustment in the United States calculation.
 
 
 27
 Commerce itself took the position put forward by Koyo, in subsequent administrative review of the comparative market values of antifriction bearings. Referring to its obligation to make a fair value comparison, in 1995 the agency stated: "Because we do not consider Koyo's doubtful debt reserve to be an actual [home market] selling expense, we agree in principle with Koyo that doubtful debt reserves should not be treated as U.S. selling expenses either." Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof from France, Germany, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom, 60 Fed.Reg. 10,900 (Dep't Comm.1995) (final results fourth administrative review).
 
 
 28
 Parallel treatment of the doubtful debt reserves was improperly withheld for the review here at issue. It is not disputed that the two reserve accounts are equivalent of purpose and are directly comparable. Both should be included in the respective calculations of indirect selling expenses, or both excluded. Smith-Corona, 713 F.2d at 1578.
 
 
 29
 We reverse the decision that had sustained disparate accounting treatment of the doubtful debt reserve in the home market and the United States market. This issue is remanded for appropriate further proceedings.
 
 
 30
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED
 
 
 
 [1]
 Koyo Seiko Co. v. United States, No. 92-07-00505, 1995 WL 495973 (Ct. Int'l Trade Aug. 16, 1995)
 
 
 [2]
 Effective January 1, 1995, the Uruguay Round Amendments Act (URAA), Pub.L. No. 103-465, 108 Stat. 4809, amended the antidumping law in a number of respects. The URAA does not apply to administrative reviews initiated before January 1, 1995. Citations are to the antidumping law before these amendments