**AIR PRODUCTS AND CHEMICALS, INC., Plaintiffs,**

v.

**UNITED STATES, Defendant,**

**Sinopec Sichuan Vinylon Works, Defendant–Intervenor,**

**Guangxi Gitic Import & Export Corp. and Guangxi Vinylon Plant, Defendant–Intervenors.**

No. Slip Op. 98–60.
Court No. 96–06–01573.

United States Court of International Trade.

May 6, 1998.

Ellis & Aeschliman, Columbus, OH (David R. Busam), Wickens & Lebow, Washington, DC (Edward M. Lebow) for Plaintiff.

Frank W. Hunger, Assistant Attorney General of the United States; David M. Cohen, Director; Cynthia B. Schultz, Commercial Litigation Branch, Civil Division, United States Department of Justice; Of Counsel, Robert J. Heilferty, Office of the Chief Counsel for Import Administration, Department of Commerce, Washington, DC, for Defendant.

Williams, Mullen, Christian & Dobbins (William E. Perry), Washington, DC, for Defendant–Intervenor, Sinopec Sichuan Vinylon Works.

Aitken Irvin Lewin Berlin Vrooman & Cohn, LLP (Bruce Aitken), Washington, DC, for Defendant–Intervenors, Guangxi Gitic Import & Export Corp. and Guangxi Vinylon Plant.

## OPINION

POGUE, Judge.

Plaintiff, Air Products and Chemicals Inc. ("Air Products"), challenges aspects of the U.S. Department of Commerce ("Commerce" or the "Department") final determination in *Polyvinyl Alcohol From the People's Republic of China*, 61 Fed.Reg. 14,057 (Dep't Commerce 1996)(final det.)("*Final Determination*").

This Court has jurisdiction pursuant to 28 U.S.C. § 1581(c)(1994) and 19 U.S.C. § 1516a(2)(B)(iii)(1994).

Plaintiff's motion for judgment on the agency record[1] raises four issues: (1) whether Commerce's assignment of a company-specific antidumping margin was in accordance with law, and if in accordance with law, whether Commerce's finding of an absence of *de jure* and *de facto* governmental control was supported by substantial evidence; (2) whether Commerce's calculation of factory overhead, general expenses and profit rates was in accordance with law, and if in accordance with law, whether Commerce's determination that VAM Organic and Polychem are equally representative of the PVA industry in India was supported by substantial evidence; (3) whether Commerce's application of the factory overhead percentage rate to total costs in the final stage of production was supported by substantial evidence; and (4) whether Commerce's calculation of indirect labor costs was in accordance with law and was supported by substantial evidence.

## Background

On March 9, 1995, Air Products filed an antidumping petition with Commerce and the United States International Trade Commission ("ITC") alleging that polyvinyl alcohol[2] ("PVA") from Japan, the People's Republic of China ("PRC"), Taiwan, and the Republic of Korea was being sold at prices below fair market value injuring the domestic industry. Commerce initiated an antidumping investigation covering entries of PVA from October 1, 1994, through March 31, 1995. *See Polyvinyl Alcohol From Japan, the Republic of Korea, the People's Republic of China, and Taiwan*, 60 Fed.Reg. 17,053 (Dep't Commerce 1995)(init. antidumping duty investigation).

In the course of its investigation, Commerce issued an antidumping questionnaire to the PRC's Ministry of Foreign Trade and Economic Cooperation ("MOFTEC") and the two known PRC producers of PVA, Guangxi Gitic Import and Export Corporation ("Guangxi") and Sinopec Sichuan Vinylon Works ("Sichuan"). P.R. Doc. No. 47, App. Def.'s Mem. Opp'n Pl.'s Mot. J. Agency R. 1 ("Govt.App."). In June, 1995, Commerce re-

ceived responses from the respondents. *See Polyvinyl Alcohol From the People's Republic of China*, 60 Fed.Reg. 52,647 (Dep't Commerce 1995)(prel.det.)("*Preliminary Determination*"). During August and September 1995, Commerce requested clarifications of the submitted questionnaire responses.

On October 10, 1995, Commerce preliminarily determined that PVA from the PRC was being sold at less than fair value. *Id.* In October and November 1995, Commerce conducted on-site verification of the PRC producers. *Final Determination*, 61 Fed.Reg. at 14,058.

On February 14, 1996, after submission of briefs by petitioner and respondents, Commerce held a public hearing. *Id.* On March 29, 1996, Commerce published its final determination. *Id.* at 14,057. Following the ITC's affirmative determination that an industry in the United States was threatened with material injury by reason of the subject imports, an antidumping duty order was entered against PVA from the PRC. *Polyvinyl Alcohol From the People's Republic of China*, 61 Fed.Reg. 24,286 (Dep't Commerce 1996)(antidumping duty ord.). Commerce found a 0 percent margin for Sichuan and a 116.75 percent margin for Guangxi. *Id.* at 24,287.

## Standard of Review

In reviewing a final antidumping determination the Court of International Trade must decide whether Commerce's determination is in accordance with law and whether Commerce's conclusions are supported by substantial evidence on the record. *See* Section 516a(b)(1)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(b)(1)(B)(1994).

## Discussion

Commerce calculates an antidumping margin by comparing an imported product's price in the United States to the normal value ("NV") of comparable merchandise. Normal value typically equals the domestic price of the product in the exporting country. When the exporting country is a nonmarket

---

1. *See* USCIT R. 56.2.

2. Polyvinyl alcohol is a dry, white to cream-colored, watersoluble synthetic polymer. *Final Determination*, 61 Fed.Reg. at 14,058.

economy ("NME")[3], the domestic product sales may not be reliable indicators of market value. In such cases, Commerce must estimate the normal value by 1) isolating each factor of the production process in the NME country, 2) choosing a surrogate market economy country at a comparable level of economic development that produces comparable merchandise, 3) assigning a value to each factor of production equal to its cost in the surrogate country, and 4) adding to those values an estimated amount for profit and general expenses. 19 U.S.C. § 1677b(c)(1994).[4]

■ The purpose of the procedure established under section 1677b(c) is to construct the product's price as it would have been if the NME country were a market economy, using the best information available regarding surrogate values. *Tianjin Machinery Import & Export Corp. v. United States,* 16 CIT 931, 940, 806 F.Supp. 1008, 1018 (1992); *Timken Co. v. United States,* 16 CIT 142, 144, 788 F.Supp. 1216, 1218 (1992).[5] Commerce used the above procedure in the determination at issue, using India as the surrogate market economy.[6]

### 1. *Company–Specific Rate v. Country–Wide Rate*

In its May 23, 1995, antidumping questionnaire to the two PRC PVA producers, Commerce advised the parties of its policy with respect to "separate" company-specific rates as follows:

> The Department presumes that a single antidumping margin is appropriate for all exporters in a nonmarket economy country. The Department may, however, consider requests for separate rates from individual exporters. Individual exporters requesting a separate rate must respond to the following questions in order for the Department to consider fully the issue of separate rates.

P.R. Doc. No. 47 at A–2, Govt.App. 1. The Department requested economic, industry and company-specific information. In its June 30, 1995 response, Sichuan provided Commerce with information regarding its eligibility for a separate rate. *See* C.R. Doc. No. 16, Govt.App. 2.

Plaintiff argues Commerce's determination that Sichuan is entitled to a separate, company-specific margin was not in accordance with law. Pl.'s Mem. Supp. Mot. J. Agency R. at 2 ("Air Product's Brief"). Plaintiff maintains Commerce improperly applied its NME methodology in determining Sichuan's independence by not requiring Sichuan to affirmatively demonstrate its independence. Therefore, Plaintiff argues, Commerce should have rejected Sichuan's submitted information and applied facts available to determine the appropriate dumping margin. *Id.; see* 19 U.S.C. § 1677e (1994).

■ For purposes of Commerce's determinations involving products from an NME country, producers and exporters in the NME country are presumed to export under the control of the central government until they affirmatively demonstrate on a *de jure* and *de facto* basis that there is an absence of government control. *Sparklers From the People's Republic of China,* 56 Fed.Reg. 20,-588, 20,589 (Dep't Commerce 1991)(final det.). This approach has been consistently upheld by this court. *Tianjin,* 16 CIT at 935, 806 F.Supp. at 1013–14 (1992); *Sigma Corp. v. United States,* 17 CIT 1288, 1302,

---

3. The term "nonmarket economy country" means any foreign country that the administering authority determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise. 19 U.S.C. § 1677(18)(A)(1994).

4. As the determination before the Court was initiated after January 1, 1995, post–Uruguay Round law applies. *Torrington Co. v. United States,* 68 F.3d 1347, 1352 (Fed.Cir.1995), *rev'd on other grounds,* 73 F.3d 378, 1995 WL 723785 (Fed.Cir.1995).

5. The cases cited by the Court regarding Commerce's NME methodology were decided under the pre-Uruguay Round version of the antidumping statute. However, this aspect of the statute was not changed by the Uruguay Round. *Compare* 19 U.S.C. § 1677b(c) (1988) *with* 19 U.S.C. § 1677b(c) (1994).

6. No party challenges the use of India as the surrogate market economy.

841 F.Supp. 1255, 1266 (1993); *Writing Instrument Mfrs. Ass'n v. United States,* 21 CIT ——, ——, 984 F.Supp. 629, 642–43 (1997), *appeals docketed,* No. 98–1178 (Fed. Cir. Jan. 9, 1998), 98–1202 (Fed.Cir. Jan. 21, 1998).

Evidence supporting *de jure* absence of government control includes: (1) absence of restrictive stipulations on individual exporters' business and export licenses; (2) legislative enactments decentralizing control of companies; or (3) formal measures by the government decentralizing control of the companies. *Tianjin,* 16 CIT at 935, 806 F.Supp. at 1014; *Sigma Corp.,* 17 CIT at 1302 n. 3, 841 F.Supp. at 1266 n. 3. Evidence supporting *de facto* absence of governmental control includes: (1) whether each exporter sets its own export prices independently of the government and other exporters; and (2) whether each exporter can keep the proceeds from its sales. *Id.*

During its on-site verification of the Sichuan manufacturing facility, Commerce officials evaluated the evidence supporting Sichuan's separate rate claim. *See* C.R. Doc. No. 60 at 1, App. Pl.'s Mem. Supp. Mot. J. Agency R. 1 ("Pl.App."). In the final determination, Commerce explained its analysis of both a *de jure* and *de facto* absence of governmental control. *Final Determination,* 61 Fed.Reg. at 14,058–60. In addition, Commerce specifically found that Sichuan acted independently from the China Petrochemical Corporation ("Sinopec"). *Id.*

Plaintiff's specific challenge to Commerce's determination is that the Department's analysis of governmental control should have been at the Sinopec level. Air Product's Brief at 7–8. As Sichuan was once part of Sinopec [7], Plaintiff argues, as part of Commerce's *de facto* standard for a separate rate entitlement, "Commerce must verify the lack of corporate control by another entity before it can consider the issue of government control." *Id.* at 8. In fact, despite its previous status, Commerce specifically found that Sichuan is independent from Sinopec.[8] Commerce explained:

> All evidence on the record supports Sichuan's assertion that there is no current relationship between Sichuan and Sinopec. . . . At verification we reviewed a wide variety of sales documents including contracts, invoices, records of payments, and correspondence and found that Sichuan acted independently from Sinopec and any other entities in its day to day business activities. We found that Sichuan officials made all decisions regarding sales pricing and contracting, appointment of management personnel, and disposition of profits, and that these decisions were neither reviewed nor approved by Sinopec or any other entity.

*Final Determination,* 61 Fed.Reg. at 14,060.

Plaintiff also argues that Commerce's determination was not supported by substantial evidence.[9] Air Product's Brief at 8. This argument has no merit.

---

7. Sichuan was founded in 1974 with funds from the Chinese government through the Ministry of Textiles. C.R. Doc. 16 at A–4, Govt.App. 2. In 1983, it became a part of Sinopec, another state-owned company engaged in the petroleum business. *Id.* Throughout verification, Sichuan maintained that, under PRC decentralization laws, Sichuan is no longer part of Sinopec. C.R. Doc. No. 60 at 1, Pl.App. 1.

8. The Court's analysis does not imply that Commerce's *de facto* standard requires a threshold finding of independence from another entity as argued by Plaintiff.

9. Plaintiff also alleges Commerce "ignored evidence that demonstrated that Sichuan was controlled by the central government." Air Product's Brief at 8. Plaintiff quotes selectively from the record and mischaracterizes Sichuan's ques-

tionnaire responses in an attempt to support this argument. First, Plaintiff argues "Commerce explicitly stated that Sichuan was unable to produce any evidence which referred to its severance of ties to Sinopec." *Id.* at 8–9. However, the statement cited by Plaintiff, concludes "we observed no indication in any part of our verification that Sinopec was involved in any of the sales or factors of production areas examined." C.R. Doc. No. 60 at 1, Pl.App. 1.

Second, Plaintiff argues "[v]erification proved that Sichuan does, in fact, report the names of its managers to governmental authorities." Air Product's Brief at 11. The Department's questionnaire asked Sichuan to indicate whether it is required to notify any governmental authorities of who the managers are, and if so to identify which government authorities and the purpose of the notification. P.R. Doc. No. 47 at A–4, Govt.App. 1. Plaintiff contends Sichuan failed to

As noted, in order to determine whether Sichuan was an independent entity, Commerce requested that the company provide economic, industry, and company-specific information. P.R. Doc. No. 47 at A–1, A–2, A–4, Govt.App. 1. In its June 30, 1995 response, Sichuan provided government regulations, the company's business license, price negotiation documents, financial statements, organization charts, sample sales documents and product sales literature. C.R. Doc. No. 16, Govt.App. 2.

During on-site verification of the Sichuan manufacturing facility, Commerce examined Sichuan's corporate structure and affiliations. C.R. Doc. No. 60 at 1, Pl.App. A–1. Commerce reviewed Sichuan's business license, its acquisition, and implications regarding ownership of the company. *Id.* A–1—A–2. Commerce examined the steps involved in planning, development, review, approval and dissemination of Sichuan's business plan. Commerce found that there "is no restriction on the business license restricting Sichuan's business to import and export. Under [certain PRC laws], it can export without going through a trade company." *Id.* A–4—A–5. "[T]he business license requires the company to operate within the scope of business as specified in the business license.... The license establishes that the company is an independent legal entity that is responsible for its own profits and losses." *Id.* A1

Sichuan also provided evidence of legislative enactments and other measures by the PRC government to decentralize control of companies. *Final Determination,* 61 Fed. Reg. at 14,058. Sichuan noted the various acts passed by the People's Congress which provide Chinese corporations with considerable autonomy with respect to production, price-setting, sales, investment, personnel

and wages. C.R. Doc. No. 16 at A–1—A–11; Govt.App. 2. In the final determination Commerce explained:

> [Commerce] has reviewed these and other enactments in prior cases and has previously determined that these laws indicate that the responsibility for managing state-owned enterprises has been shifted from the government to the enterprise itself.

*Final Determination,* 61 Fed.Reg. at 14,058. Sichuan also submitted documents which establish that PVA is not included on the list of products that may be subject to central government export constraints. *Id.* The Court finds that the evidence verified by Commerce supports a finding of a *de jure* absence of governmental control.

The evidence reviewed by Commerce also supports a finding of a *de facto* absence of government control. Commerce examined how Sichuan negotiates sales, how prices are set, and the process by which Sichuan deals with convertible currency from export sales, including whether there are any restrictions on the use of foreign currency. C.R. Doc. No. 60 at 2, Pl.App. 1. Commerce also reviewed how Sichuan's management is selected. *Id.* at 3.

Sichuan provided evidence supporting its claim that it sets prices based upon individual negotiations with U.S. importers and that "[t]hese prices are not subject to review or guidance from any governmental organization." *Id.* at 2; C.R. Doc. No. 16 at A–8, App. A–3, Govt.App. 2. Commerce also reviewed Sichuan's statement that "it does not coordinate its selling and pricing activities with other exporters, and that the PRC government has no involvement in coordinating Sichuan's export activities." C.R. Doc. No. 16 at A–8. Commerce "observed no evidence that parties outside Sichuan were involved in

---

answer these questions, therefore, "the record ... affirmatively demonstrates continued involvement by outsiders in Sichuan's business operations." Air Product's Brief at 11. The Department's questionnaire, however, required that Sichuan respond only if such notification was required. P.R. Doc. No. 47 at A–4, Govt.App. 1.

Finally, Plaintiff alleges Sichuan's maintenance of a "profits payable" account "indicates that profits sometimes may be paid to Sinopec or other government-controlled entities." Air Product's Brief at 13. Plaintiff acknowledges Com-

merce determined that Sichuan officials made all decisions regarding the disposition of profits. Nevertheless, Plaintiff contends the absence of payments during the period of investigation does not prove that profits are not paid to outside entities. Air Product's Brief at 13. The Court does not agree. Absent strong evidence to the contrary, it was appropriate for Commerce to rely upon verified evidence from the period of investigation as the basis for its determination. *Al Tech Specialty Steel Corp. v. United States,* 20 CIT ——, ——, 947 F.Supp. 510, 519 (1996).

its sales decisions." P.R. Doc. No. 60 at 2, Pl.App. 1.

Commerce verifiers also "[r]eviewed the process by which Sichuan deals with convertible currency from export sales, including whether there are any restriction[s] on the use of foreign currency." *Id.* at 3. Sichuan provided evidence that it retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses. C.R. Doc. No. 16 at A–10, Govt.App. 2. Commerce found that Sichuan was not subject to any foreign exchange targets set by any government authority and that there were no restrictions in the use of its revenues and that it controlled its bank account.[10] C.R. Doc. No. 60 at 3, Pl.App. 1.

Further, the verification team reviewed Sichuan's report that the company did not share any managers or owners with its competitors and found no inconsistencies. *Id.* Sichuan also provided a list of its management and described how it was selected. C.R. Doc. No. 16 at A–4, A–9, Govt.App. 2. During its examination of Sichuan's records, Commerce found nothing to contradict Sichuan's claims. P.R. Doc. No. 60 at 3, Pl. App. 1.

In conclusion, the Court finds there is sufficient evidence on the record supporting Commerce's determination of the absence of *de jure* and *de facto* governmental control over Sichuan's export activities. Thus, Commerce properly assigned a company-specific rate to Sichuan.

### 2. *Calculation of the Factors of Production*

### A. Calculation of Factory Overhead, G & A and Profit

■ Once Commerce determined India to be the appropriate surrogate country, it sought surrogate values for each factor of production. Commerce stated that it would select, where possible, publicly available,

published information ("PAPI"). Commerce provided interested parties with the opportunity to submit PAPI for the Department to consider when valuing the factor inputs. P.R. Doc. No. 53, Govt.App. 4; P.R. Doc. No. 54, Govt.App. 5.

In its PAPI submissions, Air Products, petitioner at the administrative level, provided rates for factory overhead, general and administrative expenses ("G & A") and profit for 1992 and 1993 based upon financial statements for VAM Organic Chemicals, Ltd. ("VAM Organic"). *See* P.R. Doc. No. 136 at Table 1, Govt.App. 6. VAM organic is an Indian producer of PVA and vinyl acetate monomer ("VAM"), a major input into PVA. P.R. Doc. No. 145 at 7, Attachment 9, Govt. App. 7 (Preliminary Valuation Memorandum, Oct. 2, 1995). In its preliminary calculations, Commerce relied upon petitioner's PAPI, and after making certain adjustments, applied a factory overhead rate of 37.44%, a general expenses rate of 45%, and a profit rate of 4.78%. *Id.*

Subsequently, Sichuan provided PAPI for factory overhead, G & A, and profit values. P.R. Doc. No. 177 at 1–2, Govt.App. 8. While Sichuan argued that information from the Indian chemical industry as a whole was preferable, it also submitted data from Polychem, Ltd. ("Polychem"), a company that Sichuan alleged to be a more significant Indian producer of PVA than VAM Organic. The values submitted by Sichuan included, a factory overhead rate of 22.03%, a general expenses rate of 29.97%, and a profit rate of 0%. *Id.* at 3.

In its final calculations, Commerce used a simple average of the factory overhead, G & A and profit percentages reported for Polychem and VAM Organic. P.R. Doc. No. 210 at 2, Attachment 5, Govt.App. 9 (Final Valuation Memorandum, March 22, 1996). Commerce applied a rate of 29.44% for factory overhead, 37.57% for general expenses, and 2.40% for profit. *Id.* Attachment 5.

---

**10.** Sichuan explained that "under a January 1, 1994, law, it is required to convert its foreign exchange proceeds into RMB, but it is permitted to maintain a foreign currency account. It keeps 100 percent of its export earnings. All of the foreign exchange earnings were exchanged by

Sichuan's banks into RMB, but Sichuan officials added that it is able to buy as much convertible currency as it wants." C.R. Doc. No. 60 at 3, Pl.App. 1. Commerce officials found "no evidence to contradict this description." *Id.*

Plaintiff challenges Commerce's calculation of factory overhead, G & A and profit, arguing that the averaging of data from both Indian producers was not in accordance with law.[11] Air Product's Brief at 25. Plaintiff argues Commerce should use VAM Organic as the sole source to calculate factory overhead, G & A and profit. *Id.* Plaintiff maintains VAM Organic is more representative than Polychem of the PVA industry in India. *Id.* In the alternative, Plaintiff contends if the Department uses information submitted by both producers, Commerce should weight-average them based on the relative proportions of PVA, VAM and VAM intermediates to total production. *Id.* at 26.

The antidumping statute provides that when an NME country is concerned, Commerce shall determine normal value

> on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses

19 U.S.C. § 1677b(c)(1)(1994). In valuing factors of production under this section, Commerce "shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are—(A) at a level of economic development comparable to that of the non-market economy country, and (B) significant producers of comparable merchandise." *Id.* § 1677b(c)(4).

■ Factory overhead is one component of a product's cost of manufacturing ("COM"), which also includes material and labor. The value of factory overhead is generally calculated as a percentage of manufacturing costs. *Magnesium Corp. of America v. United States,* 20 CIT ——, ——, 938 F.Supp. 885, 897 (1996).

11. Generally, Commerce seeks to base surrogate values upon the industry experience closest to the producer under investigation. *Final Determination,* 61 Fed.Reg. at 14,061. In this case, given the record evidence from the two producers of the subject merchandise, Commerce determined there was no need to rely upon the experience of the Indian chemical industry as a whole. *Id.*

Nothing in the antidumping statute mandates that Commerce must derive normal value in an NME case exclusively from one source in the surrogate country. The statute provides simply that "valuation of the factors of production shall be based on the *best available information*" regarding values of such factors in the surrogate country. 19 U.S.C. § 1677b(c)(1). "If the statute is silent or ambiguous with respect to [a] specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In this case, Commerce had information from two producers of the subject merchandise. Commerce reasonably decided to use an average of the available data from both producers. As Commerce explained:

> Because there is nothing in this case to indicate that one factor (i.e. sales volume or production volume) is more important than the other in valuing factory overhead, general and administrative expenses and profit, we determine that weight-averaging the data from both companies on the basis of either factor is inappropriate. Accordingly, we have weighted the data equally between each company and calculated factory overhead, general and administrative and profit percentages using a simple average of the percentages derived from each producer. . . .

*Final Determination,* 61 Fed.Reg. at 14,061. Commerce's approach comports with Congress' intent that the Department use relevant data on production of the same class or kind of merchandise. H.R. Conf. Rep. No. 576, 100th Cong., 2d Sess. 591 (1988). Accordingly, Commerce's methodology represents a permissible application of 19 U.S.C. § 1677b(c)(1).

At the administrative level, Sichuan argued that Commerce should use information from the Indian chemical industry as a whole. *Id.* at 14,060. However, before this Court no party challenges Commerce's decision not to rely on the Indian chemical industry as a whole.

Commerce's determination also must be supported by substantial evidence. *See* 19 U.S.C. § 1516a(b)(1)(B)(i). After review of the available data from Polychem and VAM Organic, Commerce determined that there was "no significant difference in the quality and representativeness of the data contained in the financial statements." *Final Determination,* 61 Fed.Reg. at 14,061. However, Commerce failed to cite evidence to support its conclusion that VAM Organic and Polychem are "equally representative" of the PVA industry in India. "[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." *SEC v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943). Accordingly, this issue is remanded to Commerce for reconsideration.

### B. Application of Factory Overhead

As noted above, Commerce calculated a factory overhead percentage using an average of the percentages derived from both Polychem and VAM Organic. To calculate a factory overhead value this percentage was applied to the COM in the last stage of PVA production. P.R. Doc. No. 145 at 7, Govt. App. 7.

Plaintiff argues the surrogate producers in India were not as "vertically integrated" as the PRC producers. Therefore, Plaintiff maintains Commerce should have applied the surrogate factory overhead percentage rate at upstream stages of PVA production in order to fully account for the factors of production. Air Product's Brief at 16. Plaintiff contends Commerce's approach understates Sichuan's production costs. *Id.*

Commerce has considerable discretion in the evaluation of factors of production. *Nation Ford Chem. Co. v. United States,* 21 CIT ——, ——, 985 F.Supp. 133, 136–37 (1997), *appeal docketed,* No. 98–1254 (Fed.Cir. Feb. 9, 1998). When examining Commerce's factual determinations "[i]t is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States,* 12 CIT 955,

962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed.Cir.1990).

The purpose of the NME statutory scheme is to arrive at the best estimate of market value in the country of export. *Magnesium Corp.,* 20 CIT at ——, 938 F.Supp. at 897 n. 64. Commerce "utilize[d], to the extent possible, the prices or costs of factors of production in one ... market economy countr[y] ... at a level of economic development comparable to that of the nonmarket economy country...." *See* 19 U.S.C. § 1677b(c)(4). Adhering to the statutory mandate, Commerce used factory overhead data taken from an investigation of two Indian producers, because they were deemed to reflect an experience close to that of PVA producers in the PRC.

According to Plaintiff, "irrefutable evidence" demonstrates that the surrogate producers in India are not as "vertically integrated" as PRC producers. Air Product's Brief at 16. Plaintiff asserts that Sichuan produces "virtually all" of the factors of production upstream from PVA production, while the Indian surrogates purchased most of their raw materials. *Id.* at 20. However, in Sichuan's questionnaire submission of July 20, 1995, the company listed twenty five material and energy inputs purchased by the company. Pl.App. 15 at App. D6 (Sichuan Section D Response, Purchased Raw Materials and Energy). Furthermore, the Indian surrogates are producers and sellers of acetic acid, the primary material for making PVA. *See* VAM 1992–93 Financial Statement at 25, Pl.App. 8; Polychem 1992–93 Annual Report at 29, Pl.App. Ex. 9. In contrast, Sichuan purchases acetic acid. Pl.App. 15 at App. D6.

Plaintiff also emphasizes that the Indian producers purchased such inputs as acetylene, oxygen, nitrogen, and treated water, while Sichuan manufactures or processes these materials itself. Air Product's Brief at 19. The Department responded to this argument in the final determination. Commerce stated:

> [T]he Indian financial statements state only that the Indian producers consume such inputs, but contain no information as to whether or not such consumption is

derived from internal manufacture. Further analysis of these documents indicates that the Indian producers have considerable investment in PVA production facilities.

*Final Determination,* 61 Fed.Reg. at 14,060. Commerce determined that such investment may in fact represent vertical integration at the same level or close to that of the PRC producers. Accordingly, the record supports Commerce's conclusion that "[t]here is no evidence ... to indicate that the Indian producers are any less vertically integrated than the PRC PVA producers." *Id.*

### C. Valuation of Indirect Labor Costs

■ Indirect labor is often accounted for in a firm's factory overhead expenses. In this case, however, upon review of the surrogate data for factory overhead, Commerce determined "indirect labor is not included in factory overhead." P.R. Doc. No. 145, at 7 n. 7, Govt.App. 7. Subsequently, Commerce calculated values for indirect labor separately based upon information provided by each producer.[12]

Sichuan calculated an indirect labor rate by dividing the amount of its indirect labor by the production total. *See* C.R. Doc. No. 60 at Ex. 39, Govt.App. 10 (Commerce's Valuation Report of Sichuan, Dec. 13, 1995). Commerce used the verified amounts reported by Sichuan in its factors of production calculation. *Id.*

At the administrative level, Plaintiff argued that a value for indirect labor should be applied to all upstream production stages. Plaintiff maintained that Commerce's methodology understated Sichuan's indirect labor costs. Pl.App. 10 at 29 (Air Product's Case Brief, Jan. 30, 1996). Commerce rejected this argument stating, "[w]e verified Sichuan's indirect labor reporting and found no

basis to add additional factors for this input ... Sichuan ... reported all indirect labor factors and no further accounting for this input is warranted." *Final Determination,* 61 Fed.Reg. at 14,063.

Plaintiff continues to assert that Sichuan significantly underreported its indirect labor cost by reporting indirect labor only for the final stage of the production process. Air Product's Brief at 23. Plaintiff contends that Commerce must apply a value for indirect labor to all upstream production stages, as in *Manganese Metal From the People's Republic of China,* 60 Fed.Reg. 56,054 (Dep't Commerce 1995)(final admin. rev.). *Id.* at 24. Plaintiff's reliance upon *Manganese Metal* is misplaced as that case is inapposite.

In *Manganese Metal,* the Department did not request and the respondents did not report any separate factors for indirect labor. 60 Fed.Reg. at 56,050. When the Department realized in *Manganese Metal* that the Indian data it was using to calculate a factory overhead rate did not include indirect labor, Commerce estimated an amount for this factor, which it added to certain indirect labor information it had gathered at verification. *Id.* In contrast, in this case Sichuan reported indirect labor information and Commerce used the verified amounts reported by Sichuan. C.R. Doc. No. 24, at 7 n. 7; C.R. Doc. No. 60 at 12, Ex. 39, Govt.App. 10.

Plaintiff also argues that Commerce's determination "not to add additional factors for indirect labor" was not supported by substantial evidence. Air Product's Brief at 24. Plaintiff maintains "the record evidence does not support Commerce's conclusion that indirect labor costs were fully reported."[13] *Id.*

In addressing factual issues, "[t]he function of this court is not to reweigh the evidence, but rather to ascertain whether [Com-

---

**12.** No party challenges Commerce's decision to calculate values for indirect labor separately.

**13.** Plaintiff argues Sichuan significantly underreported its labor costs. Plaintiff alleges there is a discrepancy between the number of workers Sichuan reported and the number of employees Sichuan has. Air Product's Brief at 24. To support this argument, Plaintiff cites an estimated number of employees that Plaintiff alleges Sichuan reported. Plaintiff extrapolated this es-

timate from various Sichuan questionnaire responses. *Id.* Plaintiff's estimated extrapolation is less than 10% of the number of employees Plaintiff alleges Sichuan has. Here, Plaintiff cites a passage from a 1988 Sichuan Company Brochure stating "[t]here are over ten thousand workers and staff members in our plant." *Id.*; Pl. App. 6 at 5. Thus, Plaintiff apparently claims that it has identified an inconsistency in Sichuan's reporting.

merce's] determination is 'unsupported by substantial evidence on the record, ....' " *Matsushita Elec. Indus. Co. v. United States,* 3 Fed. Cir. (T) 44, 54, 750 F.2d 927, 936 (1984). The possibility of drawing two inconsistent conclusions from the evidence does not prevent an agency's finding from being supported by substantial evidence. *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966) (citations omitted).

In its questionnaire responses for labor inputs, Sichuan reported the number of workers in each workshop or production step, multiplied these numbers by the weeks worked, and multiplied this result by 44, based on a workweek of 44 hours. This result was divided by the production total. *See* C.R. Doc. No. 60 at 11–12, Ex. 39, Govt. App. 10. These figures were verified by Commerce. *Id.* It is on the basis of this information that Commerce made its determination that Sichuan "reported all indirect labor factors." *Final Determination,* 61 Fed.Reg. at 14,063. Thus, Commerce's finding that there "was no basis to add additional factors for [indirect labor]" was supported by substantial evidence. That Plaintiff "can point to evidence ... which detracts from ... [Commerce's] decision and can hypothesize a ... basis for a contrary determination is neither surprising nor persuasive." *Matsushita,* 3 Fed. Cir. (T) at 54, 750 F.2d at 936. Commerce provided evidence demonstrating the accuracy of Sichuan's reported indirect labor information. Therefore, Commerce's decision not to add additional factors for this input was appropriate.

### Conclusion

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision, it is hereby

ORDERED that the issue of Commerce's determination that VAM Organic and Polychem are equally representative of the Indian PVA industry is remanded for further consideration in accordance with the Court's opinion; and it is further

ORDERED that the remand results are due on **Monday, July 6, 1998**; comments and responses are due on **Thursday, August 6,** 1998; and rebuttal comments are due on **Thursday, August 20, 1998**; and it is further

ORDERED that Plaintiff's motion is denied in all other respects and the final determination is sustained in all other respects.