Slip Op. 04 - 31

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - - - -x
THE COALITION FOR THE PRESERVATION
OF AMERICAN BRAKE DRUM AND ROTOR     :
AFTERMARKET MANUFACTURERS,
                                     :
                    Plaintiff,
                                     :
          v.                              Court No. 01-00825
                                     :
UNITED STATES,
                                     :
                    Defendant.
- - - - - - - - - - - - - - - - - - - - -x

                    Opinion & Order

[Plaintiff's motion for judgment on the
 agency record granted; remanded to the
 International Trade Administration.]

                              Decided:  April 1, 2004

     Porter Wright Morris & Arthur LLP (Leslie Alan Glick) for
the plaintiff.

     Peter D. Keisler, Assistant Attorney General; David M. Cohen,
Director, and Lucius B. Lau, Assistant Director, Commercial
Litigation Branch, Civil Division, U.S. Department of Justice
(Stephen C. Tosini); and Office of Chief Counsel for Import Ad-
ministration, U.S. Department of Commerce (Augusto Guerra), of
counsel, for the defendant.

          AQUILINO, Judge:  This case is cause to consider, yet
again, the People's Republic of China ("PRC"), which the Interna-
tional Trade Administration, U.S. Department of Commerce ("ITA")
continues to deem a "nonmarket economy country" within the meaning
of the Omnibus Trade and Competitiveness Act of 1988, Pub. L. No.
100-418, §1316(b), 102 Stat. 1107, 1187, 19 U.S.C. §1677(18)[1].  The

---

[1] That term is defined by subsection (A) of this section
1677(18) to mean

     any foreign country that the [ITA] determines does not
     operate on market principles of cost or pricing struc-
     tures, so that sales of merchandise in such country do
     not reflect the fair value of the merchandise.

matter arises out of the ITA's Notice of Final Determinations of Sales at Less Than Fair Value:  Brake Drums and Brake Rotors From the People's Republic of China, 62 Fed.Reg. 9,160 (Feb. 28, 1997), in particular, the agency's subsequent determination reported sub nom. Brake Rotors From the People's Republic of China: Final Results and Partial Rescission of Fifth New Shipper Review, 66 Fed. Reg. 44,331 (Aug. 23, 2001).

As these citations indicate, motor-vehicle brake parts cast in China have been found to have been dumped in the U.S. aftermarket encompassing automobiles, all-terrain and recreational vehicles, trucks, and vans weighing less than a ton and a half. The underlying determinations set China-wide rates of 86.02 percent for the brake drums and 43.32 percent for the brake rotors. See 62 Fed.Reg at 9,174.  Only the rotor rate, however, has remained of moment, since the International Trade Commission thereafter determined that the U.S. industry was not being materially injured or threatened with material injury by reason of the brake-drum imports.  See Certain Brake Drums and Rotors From China, 62 Fed.Reg. 18,650 (April 16, 1997), aff'd sub nom. Coalition for the Preservation of American Brake Drum & Rotor Aftermarket Mfrs. v. United States, 22 CIT 520, 15 F.Supp.2d 918 (1998).  And that country-wide rotor rate has led to applications by Chinese exporters for individuated rates in lieu thereof.

I

Such an application underlies this case.  It was made pursuant to 19 U.S.C. §1675(a)(2)(B) and 19 C.F.R. §§ 351.214, 351.221 (2000) by Shandong Laizhou Huanri Group General Co. ("Huanri General") as an alleged "new shipper" of subject merchandise produced by Laizhou Huanri Automobile Parts Co., Ltd. ("HAP"). The application represented HAP to be a "limited liability enterprise"[2] and Huanri General as a "collectively owned enterprise"[3] duly registered in China.  The application certified that the export activities of both enterprises "are not controlled by

---

[2] Plaintiff's Appendix, Pub.Doc. 3, Exhibit 4, fourth page.

[3] Plaintiff's Appendix, Pub.Doc. 3, Exhibit 3, first page; Exhibit 4, second page.  Attached to that exhibit 4 is an English translation of the Administrative Regulations of The P[RC] Governing the Registration of Legal Corporations, article 1 of which states that they have been promulgated, among other things, "to safeguard social and economic order."  Article 2 thereof provides that an

enterprise which meets the requirements of a legal person shall register as a corporation in accordance with the provisions of these Regulations if it is:

(1)  an enterprise owned by the whole people;

(2)  a collectively-owned enterprise;

(3)  an allied enterprise;

(4)  a Sino-foreign joint equity enterprise, Sino-foreign co-operative enterprise or sole foreign investment enterprise established within the territory of the P[RC];

(5)  a private enterprise; or

(6)  another type of enterprise which is legally required to register as a corporation.

the central government."[4]   Nonetheless, in its notice of review,

the ITA pointed out that

> the Department's practice in cases involving non-market
> economies [is] to require that a company seeking to
> establish eligibility for an antidumping duty rate
> separate from the country-wide rate provide de jure and
> de facto evidence of an absence of government control
> over the company's export activities.  Accordingly, we
> will issue a questionnaire to . . . Huanri . . ..  If the
> response . . . provides sufficient indication that it is
> not subject to either de jure or de facto government
> control with respect to its exports of brake rotors, each
> review will proceed.  If, on the other hand, a respondent
> does not demonstrate its eligibility for a separate rate,
> then it will be deemed to be affiliated with other
> companies that exported during the POI, and the review of
> that respondent will be rescinded.

Brake Rotors From the People's Republic of China: Initiation of

New Shipper Antidumping Duty Reviews, 65 Fed.Reg. 70,694, 70,695

(Nov. 27, 2000).  In response to the ITA's questionnaire, Huanri

General stated that it "has no relationship with any level of the

PRC government"[5]; that it established HAP, which also "has no

relationship with any level of the PRC government"[6]; and that it is

"not owned or controlled by a provincial or local government . . .

[and] has never been owned or controlled by any level of the PRC

government"[7].

---

[4] Plaintiff's Appendix, Pub.Doc. 3, Exhibit 1, first and second pages.

[5] Plaintiff's Appendix, Pub.Doc. 24, p. A-2.

[6] Id.

[7] Id. at A-3.

The agency record at bar refers to a village of Panjacun, town of Tushan, city of Laizhou, all within Shandong province, which lies to the south and east of Beijing.  A visit there by ITA staff led to the "significant" finding that

> Huanri General is owned and controlled by the Panjacun village committee which has a relationship with the Tushan town government . . ..  Accordingly, the Department must consider whether the company sufficiently demonstrated its entitlement to a separate rate.

Plaintiff's Appendix, Pub.Doc. 52, p. 3.  The staff verification report indicates that the residents of Panjacun select 41 village representatives who, in turn, elect five of their number to comprise the village's "committee".  See id. at 7.  That committee set up Huanri General with the approval of the Laizhou Industrial and Commercial Administration Bureau for the purpose of selling brake rotors and other parts and also set up other companies, including HAP.  The committee appointed the directors of those firms and named its chairman as the chairman of Huanri General. See id. at 7-8.

The petitioner, above-encaptioned, Coalition reacted to this report, in part, as follows:

> . . . [T]he fact that Huanri General is owned and controlled by a Village Committee means that it is owned or controlled by a governmental entity.  Moreover, information about the village system in China[] demonstrates that the responsibilities of the Village Committee go beyond what was disclosed by Huanri General.  It is commonly known by researchers and scholars that villages in China are the lowest official level in China's government and their leaders and committees are assisted and controlled by the government.  See A Tale of

> 2 Village[]s: China's 'Democracy' Shows Different Faces, International Herald Tribune, (August 28, 2000). . . .
>
> Village committees were instituted in 1987 with the Organic Law on Village Committees in the P[RC]. Respondent did not provide a copy of this law to the [ITA], which should have been required when it became apparent that Huanri General was owned and controlled by the Village Committee, and [] thus [] failed to affirmatively demonstrate absence of *de jure* governmental control. The village committees are responsible for supervising the management of village affairs. *See* Anhui Villagers Supporting Rural Democracy, BBC Monitoring Asia Pacific (June 19, 1998). . . . "A village committee is a self-governing organization that oversees public affairs and public welfare, mediates public disputes, maintains public order and assists the township government." *See* Why China Practices Direct Election[] of Village Committees[,] Xinhua News Agency (April 12, 1997). . . . The villagers also elect representatives who solicit opinions from villagers on major affairs of the village. The village representatives then elect five people for the village committee, which decides how the village uses profits from *village-owned businesses*, mediates civil disputes and enforces governmental policies. *See* China Villagers, AP Worldstream (April 2, 2000)(emphasis added). . . .[8]

Whereupon the petitioner requested that the ITA deny a separate antidumping-duty rate on the grounds that

> 1. Huanri General is owned and controlled by a disguised governmental entity, the Village Committee.
>
> 2. Huanri General withheld information related to its ownership structure and dealings with the town government.
>
> * * *
>
> 4. The corrections of Huanri General, Huanri Auto . . . at the start and during verification are so substantial that tainted [*sic*] the integrity of their overall responses.

Plaintiff's Appendix, Pub.Doc. 56, p. 22.

_____

[8] Plaintiff's Appendix, Pub.Doc. 56, pp. 5-6 (underscoring and italics in original). A copy of each of the underscored references is appended to this record document.

To the extent the petitioner's request also pertained to another alleged new PRC shipper, the ITA concurred, but it does not agree with regard to Huanri General, to wit:

> . . . After examining the information provided by the petitioner in the context of the laws we have examined in previous NME proceedings, we do not have a sufficient basis in this proceeding to conclude that the information provided by the petitioner constitutes grounds for conclusively determining that collectively owned companies (such as Huanri General) are controlled *de jure* by the PRC government because the information noted above does not directly relate to the company under review.

> 2. *De Facto Control*

> As stated in previous cases, there is some evidence that certain enactments of the PRC central government have not been implemented uniformly among different sectors and/or jurisdictions in the PRC. . . . Therefore, the Department has determined that an analysis of *de facto* control is critical in determining whether the respondents are, in fact, subject to a degree of governmental control which would preclude the Department from assigning separate rates.

> *   *   *

> . . . [T]he Department preliminarily finds that Huanri General has demonstrated a *de facto* absence of government control and is entitled to a separate rate for . . . several reasons. As detailed in the verification report and supported by documentation examined at verification, Huanri General was set up by the Panjacun village committee through capital voluntarily provided by all of the inhabitants of Panjacun village.  At verification, the Department further clarified that the members of the village committee were elected to the committee by the villagers who also provided the capital to set up Huanri General . . .. Data on the record establishes that the villagers are the long-term investors/shareholders in Huanri General and that the villagers determine via election the individuals who serve on the village committee.  Further, the villagers have entrusted the village committee to decide how and when Huanri General's profits are to be distributed.  In this case, the villagers have in fact elected a group within the same

village (*i.e.* the village committee) to handle the business decisions and operation strategy of the company which is wholly owned by all the villagers, some of whom are also elected members of the village committee. Based on these facts, we conclude that the central government does not control Huanri General's export activities.

The petitioner contends . . . that the village committee is a PRC government entity which has a financial relationship with the town government and that this link constitutes government control of Huanri General's operations. We have ruled in previous NME cases that companies which are either owned by local or provincial government entities or the managers of which are appointed by the provincial, not the central, government can also receive a separate rate if they sufficiently demonstrate that they are entitled to one based on the criteria set forth in *Sparklers* and amplified in *Silicon Carbide* and *Furfuryl Alcohol*. For example, in one NME case, the Department found that[,] although [] the local government owned an exporting company, that company elected its own management and was responsible for all decisions such as determining export prices, allocation and retention of profits on export sales, and negotiating export sales contracts . . .. The Department also found in another NME case that, although the provincial government appointed the management of a company, that company was entitled to a separate rate because it was able to demonstrate that it solely performed the *de facto* activities noted above and there was no evidence of significant government involvement in that company's business operations . . ..

With respect to Huanri General, the data on the record demonstrates that, unlike the situations which existed in *Lug Nuts* and *Pure Magnesium*, we have no evidence that this company is owned by the town government or that its management is appointed by the town government. Rather, this company is ultimately owned by the villagers of Panjacun village. Moreover, the president of the company (who is also the company's legal representative on the company's business license and was elected by the villagers as the chairman of the village committee) appoints the managers. Consistent with the facts in *Pure Magnesium* and *Lug Nuts*, Huanri General in this case has also demonstrated that it is responsible for all decisions such as determining export prices, allocation and retention of profits on export sales, and negotiating export sales contracts. Although the village

committee actually decides how the company's profits are to be distributed, we do not find that the village committee constitutes a form of central or provincial government control over the company, especially since all of the village committee members are investors in the company.

We also are not convinced by the petitioner's argument that the village committee's dealings with the town government constitute evidence that the town government controls both the village committee's and Huanri General's operations. Based on our examination of the village committee's financial records at verification, we found that the village committee is an entity which simply pays infrastructure taxes to the town government and to which the town government owes money . . .. Thus, in this case, the town government is a debtor to the village committee. These activities are no different than those of any company paying its taxes and operating a business without government interference in the PRC. Moreover, the information provided by Huanri General in its response and amplified and/or clarified at verification supports a preliminary finding that there is de facto absence of governmental control of the export functions of Huanri General. . . . Consequently, we have preliminarily determined that Huanri General has met the criteria for the application of separate rates.[9]

A subsequent plea by the petitioner that the ITA reconsider this preliminary determination as to Huanri General[10] was

---

[9] Brake Rotors From the People's Republic of China: Preliminary Results and Partial Rescission of the Fifth New Shipper Review, 66 Fed.Reg. 29,080, 29,082-83 (May 29, 2001), citing, among other precedent, Chrome-Plated Lug Nuts From The P[RC]; Preliminary Results of Antidumping Duty Administrative Review, 60 Fed.Reg. 42,504 (Aug. 16, 1995), and Pure Magnesium From the P[RC]: Final Results of Antidumping Duty New Shipper Administrative Review, 63 Fed.Reg. 3,085 (Jan. 21, 1998). The "NME" in this determination is, of course, an abbreviation of "nonmarket economy".

[10] As indicated above, a second enterprise, Beijing Concord Auto Technology Inc., was denied an individuated antidumping-duty rate. See 66 Fed.Reg. at 44,332.

denied, with the agency reporting that "[a]ll issues raised in the case briefs are addressed in the Decision Memo, which is . . . adopted by this notice", <u>Brake Rotors From the People's Republic of China:  Final Results and Partial Rescission of Fifth New Shipper Review</u>, 66 Fed.Reg. at 44,332.  This action ensued pursuant to 28 U.S.C. §§ 1581(c), 2631(c).

                                II

        The courts have affirmed the ITA's above-stated approach of requiring that an NME entity like Huanri General "provide de jure and de facto evidence of an absence of government control over [it]s export activities."  <u>E.g.</u>, <u>Sigma Corp. v. United States</u>, 117 F.3d 1401, 1405-07 (Fed.Cir. 1997); <u>Coalition for the Preservation of American Brake Drum & Rotor Aftermarket Mfrs. v. United States</u>, 23 CIT 88, 100-01, 44 F.Supp.2d 229, 242-43 (1999)[hereinafter referred to as "<u>Coalition Case II</u>"].

        Here, the plaintiff Coalition contends that the agency did not fully follow its own, established approach.  With regard to the *de jure* test, it points out, *inter alia*, that the

> Chinese law that regulates the establishment and func-
> tioning of village committees . . . is the Organic Law of
> the Village Committee of the P[RC] . . ., effective since
> June 1st, 1988.  . . . Huanri General <u>did not provide to
> the Department the Village Committee law</u>, although Plain-
> tiff brought this issue to the Department's attention in
> a letter dated May 2, 2001, before the Department's
> deadline for the preliminary determination, and again in
> Plaintiff's case brief dated July 16, 2001.  . . .   The
> failure of Huanri General to supply this law, which
> appears to be easily obtainable since Plaintiff was able
> to locate it, was a major omission in Huanri General's
> response.

Plaintiff's Memorandum of Law, p. 9 (emphasis in original, cita-
tions omitted).  As for the analysis *de facto*, the plaintiff arg-
ues that the ITA's verification report itself contains sufficient
evidence of government control of Huanri General to deny the
company a separate antidumping-duty rate.  <u>See</u> <u>generally</u> <u>id</u>. at 10-
17.

A

According to the court in <u>Coalition Case II</u>, to determine
whether or not *de jure* government control exists, the ITA examines
evidence of:

> (1) An absence of restrictive stipulations associ-
> ated with an individual exporter's business and export
> licenses;
>
> (2) any legislative enactments decentralizing con-
> trol of companies; or
>
> (3) any other formal measures by the government
> decentralizing control of companies.

23 CIT at 101, 44 F.Supp.2d at 242-43, citing <u>Final Determination
of Sales at Less Than Fair Value: Sparklers from the People's
Republic of China</u>, 56 Fed.Reg. 20,588 (May 6, 1991); <u>Air Products
& Chemicals, Inc. v. United States</u>, 22 CIT 433, 14 F.Supp.2d 737
(1998).

That kind of evidence is in short supply in the record at
bar.  Rather, the defendant relies on the conclusions set forth in
the agency's <u>Preliminary Results</u>, <u>supra</u>, and then reformulated in

the Issues and Decision Memorandum ("DecMemo")[11] adopted by the

Final Results.  Indeed, the defendant repeats the position now that

it was "unnecessary"[12] to produce for examination the PRC's Organic

Law of the Village Committee.[13]  That is, "this law in and of itself

is not dispositive of de jure government control".  Plaintiff's

---

[11] See Plaintiff's Appendix, Pub.Doc. 77.

[12] Defendant's Response in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record [hereinafter referred to as "Defendant's Memorandum"], p. 13, citing the Decision Memorandum, p. 5.

[13] Cf. 19 U.S.C. §§ 1677e(a) and (b) re consequences of failure to produce requested information.  Two other points asserted in support of the ITA's determination *de jure* are out of place, to wit:

> Commerce also verified that the Panjacun village
> committee fell among those elected by the local
> villagers and not those appointed by any level of
> the Chinese government[,]

and

> Commerce explained that the agency's practice since
> 1995 did not foreclose the use of separate rates for
> municipal or provincial government controlled exporters.

Defendant's Memorandum, pp. 13-14.  But they are relevant to the analysis of *de facto* control.  As this court has opined, it must evaluate the validity of an ITA determination on the basis of the reasoning presented in the decision itself.  Neenah Foundry Co. v. United States, 25 CIT ___, ___, 142 F.Supp.2d 1008, 1020-21 (2001), relying on Hoogovens Staal BV v. United States, 24 CIT 44, 86 F.-Supp.2d 1317 (2000).

> . . . While the court will uphold a decision of less-
> than-ideal clarity if the agency's path may be reason-
> ably discerned, e.g., Colorado Interstate Gas Co. v.
> FPC, 324 U.S. 581, 595 (1945), it may not conjure a
> reasoned basis for the agency's action that Commerce
> itself has not given.  SEC v. Chenery Corp., 332 U.S.
> 194, 196-97 (1947).  See also Hoogovens Staal BV v.
> United States, 22 CIT 139, 142, 4 F.Supp.2d 1213, 1219
> (1998).

Ibid.

Appendix, Pub.Doc. 77 (DecMemo, p. 5). Perhaps, but the impression the <u>Preliminary Results</u> attempt to foment, 66 Fed.Reg. at 29,082, that the agency has "analyzed" this law is not supported by the prior proceedings referred to therein, namely, <u>Final Determination of Sales at Less Than Fair Value: Furfuryl Alcohol From the People's Republic of China</u>, 60 Fed.Reg. 22,544 (May 8, 1995), and <u>Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Certain Partial-Extension Steel Drawer Slides With Rollers from the People's Republic of China</u>, 60 Fed.Reg. 29,571 (June 5, 1995). Neither they nor any other PRC-based proceedings appear to have considered that country's village committee law in particular. <u>Furfuryl Alcohol</u>, for example, refers to the Law of the P[RC] on Industrial Enterprises Owned by the Whole People (April 13, 1988), the Regulations for Transformation of Operational Mechanism of State-Owned Industrial Enterprises (Aug. 23, 1992), the Temporary Provisions for Administration of Export Commodities (Dec. 21, 1992), and to the Emergent Notice of Changes in Issuing Authority for Export Licenses Regarding Public Quota Bidding for Certain Commodities (April 1994). <u>See</u> 60 Fed.Reg. at 22,544. <u>Steel Drawer Slides</u> added to this list the Law of the P[RC] on Chinese-Foreign Contractual Joint Ventures (April 13, 1988) and the Foreign Trade Law of the P[RC] (May 12, 1994). <u>See</u> 60 Fed.Reg. at 29,573. In fact, of the five PRC laws referenced in the agency record now at bar, only two, the 1988 law with regard to industrial enterprises

owned by the whole people and the 1992 transformation regulations, were apparently considered in those cited, prior ITA proceedings. In short, defendant's attempted impression does not withstand this court's scrutiny.

Moreover, the investigations in <u>Furfuryl Alcohol</u> and <u>Steel Drawer Slides</u> entailed enterprises "owned by the whole people", the latter also involving joint ventures within the purview of the above-noted PRC Administrative Regulations Governing the Registration of Legal Corporations, whereas Huanri General alleges itself to be a collectively-owned enterprise, another and separate category of company according to those regulations. Indeed, given that their six enumerated categories of endeavor are set forth in the disjunctive, and only one thereof, number (5), is deemed "private", it can be assumed that all the other kinds are distinct forms of the Chinese people's business.  That the ITA has investigated some of them does not foreclose necessary inquiry as to a different kind, not yet considered by the agency *de jure*. What that other investigation does foreclose, however, is that a reasonable mind might accept it on its face as adequate analysis of a disparate legal status.  <u>Cf</u>. <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938).

Whatever the interpretation of the statutory standard of review in trade cases like this per 19 U.S.C. §1516a(b)(1)(B)(i), this court cannot and therefore does not conclude that the ITA's refusal to even look at the PRC law that may well govern the kind

of enterprise under review for the first time herein was in accordance with law governing this case.

B

The plaintiff is of the view that the agency's separate-rate test should not be limited to proving absence of national-government ownership but should be applied to whatever level of governmental control is implicated. See Plaintiff's Memorandum of Law, p. 5. The court concurs, given the broad statutory and concomitant administrative caution about a nonmarket economy, supra, and the longstanding emphasis of the Communist Party on the "grass roots" of China. See, e.g., Preface I to Socialist Upsurge in China's Countryside (Sept. 25, 1955), V Selected Works of Mao Tse-Tung, p. 237 (1st ed. Foreign Language Press Peking 1977). Indeed, as quoted above, the ITA's staff verification report commences with the "significant" finding that Huanri General is owned and controlled by the Panjacun village committee, which has a relationship with the Tushan town government, and accordingly, "the Department must consider whether the company sufficiently demonstrated its entitlement to a separate rate."

In its final analysis, the agency concedes that "the information in the record suggests that the village committee could be a form of government depending on the township and/or province in which it is located". Plaintiff's Appendix, Pub.Doc. 77 (DecMemo, p. 5). That analysis recites the representation of the

respondent Huanri General that the "townships are run by officials who are selected by Communist Party-dominated local legislatures"[14], and this court understands that Shandong is one of China's most important provinces for industry.  See, e.g., Hong Kong Trade Development Council, Market Profiles on Chinese Cities & Provinces (visited March 24, 2004)<http://www.tdctrade.com/mktprof/china/-mpzhj.htm>.  Hence, the ITA "determined that an analysis of *de facto* control is critical"[15] in this matter and proceeded to point out that it

> typically considers four factors in evaluating whether each respondent is subject to *de facto* governmental control of its export functions: (1) Whether the export prices are set by, or subject to the approval of, a governmental authority; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding the disposition of profits or financing of losses.

66 Fed.Reg. at 29,082.  Cf. Coalition Case II, 23 CIT at 101, 44 F.Supp.2d at 243.  Such consideration led the staff to conclude that Huanri General demonstrated a *de facto* absence of government control of its export function and was therefore entitled to a separate antidumping-duty rate.  See Plaintiff's Appendix, Pub. Doc. 77 (DecMemo, p. 5).

---

[14] Plaintiff's Appendix, Pub.Doc. 77 (DecMemo, p. 4).

[15] 66 Fed.Reg. at 29,082.

The dispositive Decision Memorandum upon which the ITA finally relies barely addresses the foregoing four factors postulated in the agency's Preliminary Results. Rather, it states with approval the staff verification that Huanri General

> was set up by the Panjacun village committee through capital voluntarily provided by all of the inhabitants of Panjacun village.

Id. at 4 (emphasis added). This collectively-owned enterprise thus may be a most-perfect form of *communism* in action. As such, there would seem to be little room to differentiate between the business of Huanri General and that of the village and governing village committee, e.g.:

> The financial records of Huanri General and the village committee examined at verification all indicated that the villagers have entrusted the village committee to decide how and when Huanri General's profits are to be distributed. Specifically, the village committee has been entrusted to handle the business decisions and operation strategy of the company which is wholly owned by all the villagers, some of whom are also elected members of the village committee.

Id. Whereupon the memorandum continues that these facts "suggest that the central government does not control Huanri General's export activities"[16]:

> . . . Although the village committee actually decides how the company's profits are to be distributed, we do not find that the village committee constitutes a form of central or provincial government control over the company, especially because all of the village committee members are investors in the company.[17]

---

[16] Plaintiff's Appendix, Pub.Doc. 77 (DecMemo, p. 4).

[17] Id. at 5. The Decision Memorandum also rejects the petitioner's contention that the Panjacun village committee is controlled by the Tushan town government. See id.

But the linchpin to this thesis is missing, namely, the village committee law, which may or may not be a promulgation of the central government and which may or may not provide that government or a subordinate, even grass-roots village, government with ultimate, nonmarket control.  In short, as is true *de jure*, without the content of that law and the ITA's analysis of the meaning thereof on the record herein, this court is unable to affirm the foregoing *de facto* reasoning.  This is the case now because none of the prior cases cited by the defendant or reviewed by the court has considered the nature and impact of that particular law under the U.S. statute that requires the ITA to take the extent of home-market government ownership or control carefully into account.  See 19 U.S.C. §1677(18)(B).

### III

In view of the foregoing, plaintiff's motion for judgment upon the agency record must be granted at least to the extent of remand to the ITA for reconsideration of its determination to grant Shandong Laizhou Huanri Group General Co. a separate antidumping-duty rate in the absence of the company's production of the PRC's Organic Law of the Village Committee and any agency analysis thereof.  The defendant may have 90 days to reopen the record in this regard and to report to the court the results of any reconsideration thereof, whereupon the plaintiff may comment within 30 days of receipt.

So ordered.

Decided:  New York, New York
          April 1, 2004                    Thomas J. Aquilino
                                                  Judge